IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MANOJ KUMAR JHA

    *Petitioner*,

    v.

UNITED STATES OF AMERICA,

    *Respondent*.

Criminal No. ELH-12-00595
Related Civil No. ELH-16-3449

**MEMORANDUM OPINION**

This Memorandum Opinion resolves a motion filed by Manoj K. Jha under 28 U.S.C.

§ 2255, seeking to vacate his convictions and sentence. ECF 180. Jha, who is self-represented,

has also filed three supplements. ECF 208; ECF 238; ECF 243 (collectively with ECF 180, the

"Petition"). Jha presents numerous issues in his post-conviction challenge.

The government filed an opposition to the initial § 2255 motion. *See* ECF 207. Jha filed

a Reply. ECF 209. By Order of November 27, 2018 (ECF 239), the Court directed the government

to respond to Jha's second supplement (ECF 238). The government's response is docketed at ECF

240. Thereafter, on December 31, 2018, Jha replied. ECF 241.

On January 14, 2019, Jha filed a third supplement, based on a claim of newly discovered

evidence. ECF 243. In particular, he complains about the government's "belatedly released

exhibits 1, 2, and 3 (ECF 240-1, 240-2, and 240-3) attached to government's response to [Jha's]

second supplement to the 2255 motion." *Id.* at 1. Jha labels this contention as ground 24. In his

view, the evidence "proves that government deliberately withheld *Brady* materials from the

defense." *Id.*

The Court directed the government to respond. ECF 244. It did so on January 31, 2019.

ECF 245. Jha replied. ECF 245.

In addition, on February 18, 2019, Jha filed a "Motion For Leave To Authorize Supplemental Discovery." ECF 247. In particular, Jha seeks to subpoena records from the United States Attorney's Office and the National Science Foundation, which he regards as relevant to his claims. *Id.*

The parties have also included numerous exhibits with their submissions. In their submissions, both sides cited to the appellate Joint Appendix ("J.A."), without providing a copy to the Court. *See, e.g.*, ECF 180 at 22; ECF 207 at 13. Therefore, by Order of November 27, 2018 (ECF 239), I directed the government to provide the Court with a copy of the Joint Appendix. The government provided a six-volume J.A. on December 14, 2018.[1] The Joint Appendix is not docketed.

Under 28 U.S.C. § 2255(b), a hearing is required "[u]nless the motion and the files and records of the case conclusively show the prisoner is entitled to no relief . . . ." This is such a case. No hearing is necessary. For the reasons that follow, I shall deny the Petition.

## I. Procedural Summary

Jha was indicted on November 14, 2012. ECF 1. A Superseding Indictment was filed on August 21, 2013. ECF 49. Through retained counsel, Jha filed numerous pretrial motions. *See, e.g.*, ECF 52 (Motion to Quash Indictment); ECF 53 (Motion to Suppress Proffer Statement and Dismiss Proffer Agreement); ECF 54 (Motion to Dismiss Counts One and Eight); ECF 55 (Motion to inspect transcripts of grand jury testimony); ECF 56 (Motion to Suppress Statements and Tangible Evidence); ECF 57 (Motion to Strike Government's Notice Pursuant to Rule 404(b)(2)); ECF 58 (Motion in Limine); ECF 65 (Motion in Limine).

---

[1] Prior to the submission of the J.A., the Court had already spent considerable time to search the trial transcripts to find references that correlated with the parties' assertions.

The Court held pretrial motions hearings on February 14, 2014 (ECF 77); February 19, 2014 (ECF 83); and February 24, 2014 (ECF 89). A nine-day jury trial began on March 18, 2014. On April 1, 2014, the jury convicted Jha of all charges: three counts of wire fraud, in violation of 18 U.S.C. § 1343; mail fraud, in violation of 18 U.S.C. § 1341; falsification of records, in violation of 18 U.S.C. § 1519; and federal program fraud, in violation of 18 U.S.C. § 666. ECF 118; ECF 119.

Sentencing was held on August 29, 2014. ECF 134. The Presentence Report ('PSR," ECF 123) found an offense level of 27 and a criminal history category of I. ECF 12. At sentencing, the Court resolved several disputes concerning the calculation of the advisory sentencing guidelines, including the determination of the amount of the loss and whether Jha was subject to an enhancement for obstruction of justice, as a result of his trial testimony. *See* ECF 158 (sentencing transcript) at 8-9, identifying the disputes). Although the Presentence Report ("PSR", ECF 123) applied a two-level upward adjustment for obstruction of justice under U.S.S.G. § 3C1.1, the Court declined to apply it.

As a result, the Court determined that Jha had a final offense level of 25. ECF 158 at 70. Therefore, his final advisory sentencing guidelines range called for a period of incarceration ranging from 57 to 71 months. *See* ECF 158 at 70; ECF 138.

The government sought a sentence of 65 months' incarceration. ECF 158 at 78. But, the Court sentenced Petitioner to a below-guidelines term of imprisonment of 36 months. ECF 137. The Court also ordered restitution in the amount of $105,726.31.

An Amended PSR (ECF 133) was filed to conform to the Court's rulings. Judgment was entered on September 11, 2014. *See* ECF 137. Thereafter, Jha timely noted an appeal to the United States Court of Appeals for the Fourth Circuit. ECF 135.

The Fourth Circuit affirmed Jha's convictions and sentence in an unpublished opinion issued on June 4, 2015. ECF 163; *see United States v. Jha*, 613 Fed. App'x 212 (4th Cir. 2015) (per curiam). The mandate issued on June 26, 2015. ECF 164. Thereafter, Jha filed a petition for a writ of certiorari to the United States Supreme Court, which was denied on October 13, 2015. *See* 136 S. Ct. 349 (2015). Then, on December 7, 2015, the Supreme Court denied Jha's petition for reconsideration. *See* 136 S. Ct. 611 (2015).

Jha has filed numerous post-trial motions with this Court, which include the following: "Fed. R. Crim. P. 33 Motion To Vacate The Judgment Of Conviction, Sentence And Restitution, And Order A New Trial ('Rule 33 Motion')"; (ECF 166); "Motion For Reconsideration And To Recall The Court's Extension Request Of The Government" (ECF 170), "Motion And Affidavit For Disqualification And Recusal Of The Trial Judge" (ECF 182); "Motion For Supplemental Discovery To Uncover Full Scope Of Judge Ellen Hollander's Bias" (ECF 189); "Motion For Release Or Home Confinement Pending Disposition Of The 2255 Motion" (ECF 190); "Motion For Extension Of Time To File Memorandum In Support Of ECF 180" (ECF 193); Objection To The Order Denying Motion For Release From Custody (ECF 197); "Notice To The Court" (ECF 200), claiming the government failed to serve copies of its filings; "Application To The Chief Judge For Disciplinary Action As To The Prosecutor" (ECF 205); correspondence requesting information from the prosecution's file (ECF 210); a request for stay as to ECF 180, pending the filing of a petition for certiorari in the Supreme Court (ECF 211); "Motion To Enforce The Court's Order For Restitution As Is" (ECF 213); correspondence regarding admission of facts (ECF 215); and "Second Motion For Recusal Of Judge Hollander" (ECF 217).

In addition, Jha filed assorted "housekeeping" motions. These included a request to travel (ECF 226); a motion for release of his passport (ECF 235); and a motion to file electronically.

ECF 220; ECF 230. I granted Jha's request for electronic filing. ECF 231. I also approved the return of his passport (ECF 236), and I approved his request for foreign travel. ECF 227.

In a Memorandum (ECF 173) and Order (ECF 174) of June 13, 2016, I denied the Rule 33 Motion. Thereafter, Jha noted an appeal to the Fourth Circuit. ECF 175; Appeal 16-6856. On November 22, 2016, the Fourth Circuit affirmed in a per curiam opinion. ECF 185. However, the mandate was stayed (ECF 188), pending Jha's petition for rehearing and rehearing en banc. Those requests were denied (ECF 191) and the mandate issued on February 1, 2017. ECF 192.

In a Memorandum (ECF 198) and Order (ECF 199) of February 24, 2017, I denied Jha's first motion for recusal (ECF 182); his motion for supplemental discovery (ECF 189); and his objection (ECF 197). But, I granted his motion for extension of time (ECF 193).

Jha filed a petition for a writ of mandamus with the Fourth Circuit in October 2017. *See* Appeal 17-2210. There, he sought an order from the Fourth Circuit directing this Court to recuse itself from Jha's § 2255 proceedings. In addition, in December 2017, in Appeal No. 17-2210, Jha filed a "Motion For Equitable Vacatur Of Previous Judgment Procured From Fraud on the Court," asking the Fourth Circuit to vacate its affirmance of his convictions. In an unpublished, per curiam opinion of February 1, 2018, the Fourth Circuit denied Jha's recusal request, as well as his request to vacate its opinion affirming Jha's criminal conviction. *See In re: Manoj Kumar Jha*, 710 Fed. App'x 127 (4th Cir. 2018) (per curiam).[2]

On February 2, 2018, Jha filed a second motion in this Court, again seeking my recusal and disqualification. ECF 217. By Memorandum and Order (ECF 233; ECF 234) of June 12, 2018, I denied the second motion for recusal. Jha filed yet another petition for a writ of mandamus, asking the Fourth Circuit to direct the recusal of this Court. In an unpublished, per curiam opinion, issued

_____

[2] The appellate opinion does not appear on the trial court docket in this case.

on October 25, 2018, the Fourth Circuit rejected that mandamus petition. *See* Appeal No. 18-1718; *In Re: Manoj Kumar Jha*, 740 Fed. App'x 336 (4th Cir. 2018) (per curiam).[3]

As noted, this Memorandum Opinion addresses Jha's motion to vacate under 28 U.S.C. § 2255 (ECF 180), as supplemented three times. *See* ECF 203; ECF 238. The initial motion contains ten claims of alleged error. ECF 180. The first supplement (ECF 203) contains an additional ten claims, although several of them are duplicative of the contentions asserted in the original petition. In Petitioner's submission on November 9, 2018 (ECF 238), Jha added grounds twenty-one through twenty-three. And, in his latest submission, filed January 14, 219 (ECF 243), he added ground 24.

The Petitioner is now on supervised release. However, the government acknowledges that his claims are not moot, in light of the potential collateral consequences arising from his convictions. ECF 207 at 3.

## II. Factual Summary[4]

At the relevant time, Jha was employed full-time as an engineering professor at Morgan State University ("MSU" or "Morgan") in Baltimore, Maryland. He was also the sole owner and operator of a for-profit company, Amar Transportation Research & Consulting, Inc. ("ATRC"). ATRC's principal place of business was the same as Jha's personal residence in Severn, Maryland.

Beginning in June 2007, the defendant used ATRC in an attempt to obtain $700,000 in federal research funds in the form of grants from a program sponsored by the National Science Foundation ("NSF"), titled the Small Business Technology Transfer Program ("STTR"). NSF's

---

[3] This appellate decision does not appear on the trial court docket.

[4] Given the posture of the case, the facts are presented in the light most favorable to the government.

STTR program offers research grants to "small business concerns" ("SBC") willing to collaborate with large research institutions. ATRC, as the SBC, collaborated with the University of Maryland, a research institution.

The STTR program required, *inter alia*, that the person serving as the Primary Investigator ("PI") with respect to the proposed STTR project must be "primarily employed" by the SBC that receives the STTR grant. The PI of the SBC is responsible for the day-to-day management and operation of the STTR project.

Jha represented to the NSF that the grants would be used for a research proposal he titled *A MultiObjective Bilevel Approach to Highway Alignment Opitmization* (the "Highway Project"). Although Jha was a full-time employee of MSU, he identified himself as the PI on ATRC's grant applications during each of three phases of the STTR award process.

On June 13, 2007, Jha filed an online application with NSF on behalf of ATRC for Phase I funding in the amount of $150,000. Phase I requires a feasibility study to determine the suitability of the research topic. On November 7, 2007, the NSF awarded ATRC a STTR grant of $150,000.

Jha submitted an online application with NSF on October 16, 2008, seeking STTR supplementary Phase IB funding of $50,000 for ATRC's Highway Project. In order to qualify for the grant of $50,000, Jha had to demonstrate that ATRC had obtained $100,000 from a third-party investor. The NSF awarded ATRC the maximum Phase IB STTR grant of $50,000 on January 15, 2009.

On January 31, 2009, Jha filed an online application with NSF on behalf of ATRC for STTR Phase II funding for the Highway Project. The research proposal sought the maximum allowable grant of $500,000 to fund 24 months of additional research. To qualify for a Phase II grant, the defendant had to show that ATRC successfully completed the Phase I research project

and ATRC had to submit to a financial review by NSF's Cost Analysis and Audit Resolution Branch ("CAAR").

On September 2, 2009, based on CAAR's financial review, the NSF declined to award the $500,000 Phase II STTR grant to ATRC. It cited CAAR's inability to complete the financial review due to problems with ATRC's accounting system and lack of financial resources.

NSF's Office of Inspector General ("OIG") discovered that all three of the defendant's research proposals and supporting documentation contained numerous misrepresentations.

First, Jha misrepresented his ability to act as the PI for the Highway Project by certifying that he was primarily employed by ATRC during the research period when, in fact, he was employed as a full-time professor at Morgan.

Second, Jha falsely represented that a company called KM Infotech and an individual named Kishore Ampani had invested $100,000 in ATRC. He sent copies of KM Infotech checks to NSF totalling $100,000, and made it appear that KM Infotech provided funds to ATRC. But, it was a sham transaction; no such corporate funds were ever invested. To illustrate, the defendant took $25,000 from his own bank account, which was then deposited into Ampani's account. He then instructed Ampani to transfer the money to KM Infotech, which then wrote a check to ATRC in the amount of $25,000.

Third, the defendant falsely represented the number of employees hired by ATRC and their job descriptions. Fourth, the defendant misrepresented the extent to which UM participated as the collaborating research institution in regard to the Highway Project by spending the UM's $20,000 sub-award as well as $12,000 that UM had attempted to return to NSF.

According to the government, Jha misrepresented his intended use of the STTR grants by providing research budgets that concealed his conversion of some of those funds to his personal

use. He paid down the principal on his home mortgage, paid off personal credit cards, paid an unauthorized salary to his wife, and overpaid himself.

On February 15, 2011, as part of its investigation, OIG demanded certain information from ATRC and the defendant. In response to the investigative demand, the defendant provided investigators with altered corporate records that concealed his lack of adequate recordkeeping and his misuse of the funds, including a falsified expenditure ledger and bogus employee timesheets.

During the course of OIG's investigation, agents also discovered that the defendant had executed a scheme to defraud yet a different federal program. In particular, it uncovered information showing that Jha demanded kickbacks from graduate students at Morgan for whom he authorized research stipends payable from two MSU research projects funded by the Department of Defense. While serving as one of the PIs on those research projects, the defendant offered his graduate students research stipends on the condition that they agree to give him a portion of the stipend money. Several of Jha's former students testified at trial about Jha's demands and their kickback payments to him, in compliance with Jha's demands. Jha spent most of the money on personal expenses.

### III.    Section 2255

Section 2255(a) of Title 28 of the United States Code provides relief to a prisoner in federal custody only on specific grounds: that the sentence was imposed in violation of the Constitution or laws of the United States; that the court was without jurisdiction to impose such a sentence; that the sentence was in excess of the maximum authorized by law; or that the sentence is otherwise subject to collateral attack. *See Hill v. United States*, 368 U.S. 424, 426-27 (1962) (citing 28 U.S.C. § 2255); *United States v. Newbold*, 791 F.3d 455, 459 (4th Cir. 2015).

"[A]n error of law does not provide a basis for collateral attack unless the claimed error constituted 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *United States v. Addonizio*, 442 U.S. 178, 185 (1979) (quoting *Hill*, 368 U.S. at 428). In other words, the movant must establish (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law so fundamental as to render the entire proceeding invalid. *Moss v. United States*, 323 F.3d 445, 454 (6th Cir. 2003).

The scope of a collateral attack under § 2255 is far narrower than an appeal, and a "'collateral challenge may not do service for an appeal.'" *Foster v. Chatman*, ___ U.S. ___, 136 S. Ct. 1737, 1758 (2016) (quoting *United States v. Frady*, 456 U.S. 152, 165 (1982)). Thus, any failure to raise a claim on direct appeal constitutes a procedural default that bars presentation of the claim in a § 2255 motion unless the petitioner can demonstrate "cause and actual prejudice resulting from the errors of which he complains," or "actual innocence." *United States v. Pettiford*, 612 F.3d 270, 280 (4th Cir. 2010) (citing *United States v. Mikalajunas*, 186 F.3d 490, 492-93 (4th Cir. 1999)). *See Bousley v. United States*, 523 U.S. 614, 621 (1998) ("Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal.") (internal quotations and citations omitted); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *see also Dretke v. Haley*, 541 U.S. 386, 393 (2004); *Reed v. Farley*, 512 U.S. 339, 354 (1994) ("the writ is available only if the petitioner establishes 'cause' for the waiver and shows 'actual prejudice resulting from the alleged violation.'").

Under the "cause and prejudice" standard, the petitioner must show: (1) cause for not raising the claim of error on direct appeal; and (2) actual prejudice from the alleged error. *Bousley*, 523 U.S. at 622; *see also Dretke*, 541 U.S. at 393; *Reed*, 512 U.S. at 354; *Frady*, 456 U.S. at 167-68.

In order to show cause for failure to raise a claim of error on direct appeal, a petitioner must prove that "some objective factor external to the defense such as the novelty of the claim or a denial of effective assistance of counsel" impeded counsel's efforts to raise the issue earlier. *Coleman v. Thompson*, 501 U.S. 722, 753 (1991); *see also Carrier*, 477 U.S. at 492 ("[C]ause . . . requires a showing of some external impediment preventing counsel from constructing or raising the claim."); *Mikalajunas*, 186 F.3d at 493 (movant must demonstrate "something external to the defense, such as the novelty of the claim or a denial of effect assistance of counsel"). Additionally, the alleged error cannot simply create "a *possibility* of prejudice," but must be proven to work to the petitioner's "*actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170 (emphasis in original). Put another way, prejudice does not support relief of a procedural default in the absence of a showing of cause. *Carrier*, 477 U.S. at 494; *Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982).

Claims previously litigated on direct appeal are generally not cognizable under § 2255. *Schlup v. Delo*, 513 U.S. 298, 318-19 (1995). In *Boeckenhaupt v. United States*, 537 F.2d 1182, 1183 (4th Cir. 1976), the Court said that a petitioner "will not be allowed to recast, under guise of a collateral attack, questions fully considered" and decided on direct appeal. *See also Abbamonte v. United States*, 160 F.3d 922, 924 (2d Cir. 1998). However, failure to raise on direct appeal a claim of ineffective assistance of counsel is not regarded as procedurally defaulted. *Massaro v. United States*, 538 U.S. 500, 509 (2003). Thus, such a claim is not barred under § 2255.

I discuss the concept of actual innocence, *infra*. I next turn to review the standard for a claim of ineffective assistance of counsel.

## IV.    Ineffective Assistance

The Sixth Amendment guarantees a criminal defendant the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see also Buck v. Davis*, ____ U.S. ____, 137 S. Ct. 759, 775 (2017).  Ineffective assistance of counsel is a well recognized basis for relief under 28 U.S.C. § 2255.  *See generally Missouri v. Frye,* 566 U.S. 134 (2012); *Lafler v. Cooper*, 566 U.S. 156 (2012); *Padilla v. Kentucky*, 559 U.S. 356 (2010).

To mount a successful challenge under 28 U.S.C. § 2255, based on a Sixth Amendment claim of ineffective assistance of counsel, a petitioner must satisfy the two-prong test set forth in *Strickland v. Washington,* 466 U.S. 668, 687–88 (1984).  *See Chaidez v. United States,* 568 U.S. 342, 348 (2013); *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000); *Lafler,* 566 U.S. at 162-63; *Hill v. Lockhart,* 474 U.S. 52  (1985); *United States v. Rangel*, 781 F.3d 736, 742 (4th Cir. 2015); *Richardson v. Branker*, 668 F.3d 128, 139 (4th Cir. 2012); *United States v. Higgs*, 663 F.3d 726, 735 (4th Cir. 2011); *see, e.g., United States v. Baker,* 719 F.3d 313, 318 (4th Cir. 2013).

The first prong is known as the "performance prong," which relates to professional competence.  The petitioner must show that his attorney's performance fell "below an objective standard of reasonableness," measured by "prevailing professional norms."  *Strickland,* 466 U.S. at 688; *see United States v. Powell*, 850 F.3d 145, 149 (4th Cir. 2017).  The burden is on the petitioner to establish "'that counsel made errors so serious that "counsel" was not functioning as the 'counsel' guaranteed by the Sixth Amendment.'"  *Harrington v. Richter*, 562 U.S. 86, 88 (2011) (quoting *Strickland*, 466 U.S. at 687).

As the Supreme Court recently reiterated, the "first prong sets a high bar."  *Buck*, 137 S. Ct. at 775; *see also Powell*, 850 F.3d at 149.  "The lawyer has discharged his constitutional responsibility so long as his decisions fall within the 'wide range of professionally competent

assistance.'" *Buck*, 137 S.Ct. at 775 (citation omitted). Consequently, the performance prong is "'difficult'" to establish. *Lawrence v. Branker*, 517 F.3d 700, 709 (4th Cir. 2008) (quoting *James v. Harrison,* 389 F.3d 450, 457 (4th Cir. 2004)).

"Keenly aware of the difficulties inherent in evaluating counsel's performance, the Supreme Court has admonished that courts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Lawrence*, 517 F.3d at 708 (quoting *Strickland,* 446 U.S. at 689); *see Harrington*, 562 U.S. at 104; *Lee v. Clarke*, 781 F.3d 114, 122 (4th Cir. 2015). Indeed, "the *Strickland* standard must be applied with scrupulous care," *Harrington*, 562 U.S. at 105, and "the standard of judging counsel's representation is a most deferential one." *Id.* The central question is whether "an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington*, 562 U.S. at 88 (quoting Strickland, 466 U.S. at 690).

Second, the petitioner must show that his attorney's deficient performance "prejudiced" her defense. *Strickland*, 466 U.S. at 687. To satisfy the "prejudice prong," a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceedings. *Id.*

The *Padilla* Court said, 559 U.S. at 371: "Surmounting *Strickland's* high bar is never an easy task." Accordingly, a petitioner is not entitled to post-conviction relief based on prejudice where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

A court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697. Nor must a court address both components if one is dispositive. *Jones v. Clarke*, 783 F.3d 987, 991 (4th Cir. 2015). Failure to satisfy either prong is fatal to a petitioner's claim. As a result, "there is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

## V.     Discussion

### A.  Claims One, Eleven, and Twenty-One:  Judicial Bias

Jha repeatedly insists that this Court was biased against him and has favored the government throughout the litigation. *See*, *e.g.*, ECF 180 at 9-20; ECF 203 at 2-3. As the government notes, ECF 207 at 9, Jha never raised this issue on direct appeal, nor did he assert it in his Motion for New Trial (ECF 166) or in his appeal challenging the denial of that motion. *See* ECF 174. Thus, the government claims procedural default. ECF 207 at 10.

Many of Jha's claims of bias were addressed previously by this Court in its denial of Jha's two motions for recusal. *See* ECF 182 (first motion for recusal); ECF 217 (second motion for recusal); ECF 198 (Court's Memorandum as to first recusal motion); ECF 199 (Order denying first recusal motion); ECF 233 (Court's Memorandum as to second recusal motion); ECF 234 (Order denying second recusal motion). For example, I previously addressed Jha's fallacious claim (ECF 238 at 3-5) that the Court engaged in ex parte communications with the government. *See* ECF 233 at 6-8.

In my view, Jha has done little more than reassert or repackage his earlier complaints. The Court's prior rulings in regard to the recusal motions are dispositive of Jha's claims of bias, and I incorporate those rulings here.

As I said previously (ECF 233 at 8), "if any legitimate basis existed for me to recuse myself from this case, I would have done so, if for no other reason than to avoid spending precious time on frivolous filings." But, under my oath, I must "handle dutifully the cases assigned to me." *Id.*

## B. Claims Two, Twelve, Thirteen, Fourteen, Twenty-Two, and Twenty-Four: *Brady* and *Giglio*

Jha lists multiple ways in which he claims the government violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). ECF 180 at 21-24; ECF 203 at 4-6; ECF 238 at 10-15.

In *Brady*, 373 U.S. at 87, the Supreme Court expressly held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *See also United States v. Agurs*, 427 U.S. 97, 106-07 (1976); *United States v. Young*, ___ F.3d ___, 2019 WL 757835 at *8, n.9 (4th Cir. Feb. 21, 2019). *United States v. Horton*, 693 F.3d 463, 470 (4th Cir. 2012). Thus, a *Brady* violation occurs when a defendant can show that the evidence at issue (1) was favorable to the defendant, (2) material to the defense, and (3) the prosecution had the evidence but failed to disclose it. *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972); *Young*, 2019 WL 757835, at *9; *United States v. Sarihifard*, 155 F.3d 301, 309 (4th Cir. 1998).

A nondisclosure is "material" when there is a reasonable probability that, had the evidence been disclosed, the result of the proceedings would have been different. *See Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995); *United States v. Bagley*, 473 U.S. 667, 682 (1985); *United States v. Kelly*, 35 F.3d 929, 936 (4th Cir. 1994). But, a *Brady* violation does not occur when the alleged exculpatory material is available to the defendant from "a source where a reasonable defendant would have looked." *United States v. Wilson*, 901 F.2d 378, 380-81 (4th Cir. 1990). Moreover,

mere speculation as to the materials is not enough. *United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010).

*Giglio* is closely akin to *Brady*. A *Giglio* violation occurs when the government withholds evidence that would tend to impeach a government witness. *Giglio*, 405 U.S. at 154-55; *see Bagley*, 473 U.S. at 676.

Even assuming, *arguendo*, a *Giglio* or *Brady* violation, such a claim is of no moment unless there is a "reasonable probability that its disclosure would have produced a different result." *United States v. Parker*, 790 F.3d 550, 558 (4th Cir. 2015); *see United States v. Bartko*, 728 F.3d 327, 340 (4th Cir. 2013). The standard is satisfied if "the likelihood of a different result is great enough to undermine confidence in the outcome of the trial." *Bartko*, 728 F.3d at 340; *see Bagley*, 473 U.S. at 682.

Jha did not raise these claims on direct appeal. Moreover, they lack factual and legal merit.

The government acquired the MSU emails by way of a search warrant that was deemed lawful by this Court, and that decision was upheld on appeal. Moreover, pursuant to Rule 16 pretrial disclosures, the government provided the defense with two other locations for which the government had issued search warrants: the defendant's personal gmail account and the NSF server. *See* ECF 69 at 10, n.2.

Jha also contends that Special Agent Douglas Morgan "was found guilty of lying under oath in a separate proceeding." ECF 180 at 22. Jha maintains that "Morgan's falsity was summarized in a report prepared by HUD investigators." *Id.* And, he complains that "the government never gave a copy of the HUD report to [the] defense so that the defense could have adequately prepared to cross-examine Morgan . . . ." *Id.* Therefore, Jha maintains that the government violated *Giglio*. *Id.*

Contrary to Jha's assertions, the findings of the HUD report were disclosed to Jha. His counsel was also permitted to cross-examine Special Agent Morgan on the topic. *See* ECF 173 at 11-12. Moreover, considering all of the evidence against Jha, this claim is of little significance, and certainly does not undermine confidence in the trial.

Further, Jha complains that he was not provided with a copy of the "Operations Plan" in connection with the execution of the search warrant for his residence on April 20, 2012. This claim is belied by the record.

During the rebuttal testimony of Special Agent Michael Pritchard at the suppression hearing held on February 19, 2014, the government introduced the "Operations Plan" that Pritchard "created" for the execution of the search warrant. ECF 147 at 38 (Transcript). Jha asserts that the Operations Plan addresses a plan to secure all "residents." ECF 180 at 22. But, he claims that the Court "induced Pritchard to say that the word 'residents' was a typo and it should have been 'residence.'" *Id.* (citing J.A. 521-22). He insists that the "original word 'residents' bolstered [the] defense's theory that, when Jha's statement was taken, he [was] in an arrest-like situation. Changing the word to 'residence' changed the meaning of the plan . . . at Judge Hollander's initiative." *Id.*

At the hearing, Pritchard read from GX7 and stated, in part: "After the residents are secured . . . ." J.A. Vol. II, page 521. Noting the use of similarly sounding words – residence and residents – the Court said, *id.*: "My question was, it seemed like it was a typo [in the Operations Plan] and it should have been after the residence, R-E-S-I-D-E-N-C-E, is secured. But that isn't what it says." The Court also asked, *id.* at 522: "So did you in any way somehow secure the residents, R-E-S-I-D-E-N-T-S?"

The Court merely clarified the confusion; the Court did not induce testimony. Nor was the Operations Plan pertinent to the Court's ruling that, under *Miranda*, the defendant was not in custody at the time of the search of his home. Indeed, recent Fourth Circuit case law supports this Court's prior ruling. *See United States v. Azua-Rinconada*, ___ F.3d ___, 2019 WL 333794 (4th Cir. Jan. 28, 2019).

Jha also complains that the government used a so called "ROUTS letter," seized from his house and suppressed by the Court, instead of a duplicate of the letter, which the government acquired from a federal agency, USCIS. SA Pritchard testified that he had acquired a copy of the ROUTS letter in the search of the house, but also obtained a copy from USCIS. The Court found the agent's testimony to be credible and ruled that the USCIS copy of the ROUTS letter came from a source independent of the search. *See* J.A. 795-98. ECF 180 at 22-23; ECF 238 at 10-15; ECF 243 at 2-3.

The Court ruled that the government could not use the ROUTS letter obtained from Jha's home, but could use the ROUTS letter if a copy was independently obtained from a federal agency. Jha contends that the government never "produced any evidence showing proof of the receipt of the ROUTS letter" from an agency. ECF 180 at 23. Thus, Jha baldly alleges that "it was reasonably likely that [the] government . . . falsely asserted in the Court that it obtained an identical letter" from a federal agency. *Id.*

As the government puts it, Jha has an "obsession to prove the government committed fraud to secure his conviction . . . ." ECF 245 at 3. He asserts that "perhaps [the] government played a dirty game by using the ROUTS letter seized from Jha's house (which was suppressed by the Court) but falsely claiming that an identical copy of the letter was obtained in Summer of 2012 from the USUS . . . ." ECF 238 at 12.

In ECF 238, Jha asserts that, based on responses to a recent FOIA request, the government inaccurately claimed that it independently obtained a second copy of the ROUTS letter from the United States Citizenship and Immigration Service, in addition to one Jha claims was unlawfully obtained from his home. *See* J.A. Vol. II, 786-87; 795. Further, he asserts that the FOIA response establishes that there was no KM Info Tech file. ECF 238 at 12-14.

As the government posits, the response to the FOIA request is not probative here. ECF 240 at 6. Moreover, the government's exhibits (ECF 240-1, 240-2, 240-3) demonstrate that Jha's claims are unfounded. And, at a suppression hearing, Jha introduced the ROUTS letter of August 21, 2006, as an exhibit, during the cross-examination of Special Agent Pritchard. *See* J.A. Vol. II, page 785-98.

However, in Jha's latest submission (ECF 243), he challenges the emails that the government submitted with its response to Jha's second supplement, asserting they were belatedly produced, in violation of *Brady*. In response, the government maintains that the exhibits "completely undercut" Jha's contention as to the ROUTS letter and show its independent agency source. In any event, it argues that it was not required to disclose all inculpatory evidence confirming Pritchard's testimony. ECF 245 at 4; *see also* J.A. 795-798.

Moreover, the government argues that the information was not belatedly produced. ECF 245 at 4. It points to Jha's post-conviction allegations, "hypothesizing" a conspiracy between the prosecutors and the agents to defraud, so as to render the exhibits useful. *Id.* at 4-5. It explains, *id.* at 5: "Their inclusion was meant to clarify the existence of information that Jha had requested under FOIA to try to prove his unfounded claim while simultaneously providing additional definitive information that the USCIS copy of the ROUTS letter existed in the KM InfoTech on file with USCIS, information that corroborates SA Pritchard's testimony." The government adds,

*id.*: "Faced with the fact that the very evidence [Jha] sought to prove never existed did indeed exist, Jha now disingenuously posits various ways that an earlier disclosure of the Attachments would have been favorable to him within the meaning of *Brady*."

There is no merit to the claim of improper, belated production of exhibits by the government. The exhibits were produced to refute Jha's post-conviction contentions, and to establish that the government complied with the Court's instructions at trial. The government's discovery obligation before trial did not require wholesale production of every document in its possession. *See* Fed. R. Crim. P. 16.

Jha also protests that the government "introduced a forged and fraudulent slide set at trial," in order "to prove Jha's mens rea to commit the alleged crimes." ECF 180 at 23. According to Jha, the government failed to disclose the contents of the slide set prior to trial. As a result, he claims that his counsel was not well prepared for the cross-examination regarding "the authenticity of the slides." *Id.* at 24. In his view, the government's conduct amounted to "yet another *Brady* violation . . . ." *Id. See also* ECF 203 at 6-7.

There is no basis to support Jha's bald assertion that the slides were "forged and fraudulent." Nor was such a claim advanced on appeal. Further, in ECF 65, filed on January 3, 2014 − well before the trial − the defense asked the Court to bar the government from "referencing a slide presentation from a March 2008 NSF workshop as the basis for alleging criminal violations in June 2007." *Id.* at 3. This belies Jha's claim that the government failed to provide the slides to the defense prior to trial.

### C. Claims Three, Four, and Fifteen: Perjurious Testimony

Jha audaciously contends, without substantiation, that, with the knowledge of the prosecution, five witnesses testified perjuriously during pretrial hearings, and seven witnesses

committed perjury at trial. ECF 180 at 24-29; ECF 203 at 8-10. For example, Jha claims that NSF Special Agent Pritchard lied when he said that, during the execution of the search and seizure warrant at Jha's home, Jha did not ask for an attorney. ECF 180 at 25. Further, Jha claims that Prichard described Jha as calm during the execution of the warrant when, in fact, as Agent Anna Amores explained, Jha was quite "agitated throughout the day." *Id.*

Jha goes on at length to point out inconsistencies in the testimony of various witnesses which, in his view, demonstrate perjurious testimony. To illustrate, Jha cites to the testimony of Agent Pamela Castelberry; Agent Doug Morgan; NSF attorney Montgomery Fisher; NSF Program Manager Errol Arkillic; NSF Program Manager Ian Bennett; and MSU employee Rochelle Massey. *See*, *e.g.*, ECF 203 at 8; ECF 180 at 24-29. And, he insists that government co-counsel Sara Damelin, an attorney with NSF, "deliberately introduced false evidence at trial." *Id.* at 29. He asserts, *id.* at 30: "Damelin's most egregious conduct was introduction of a forged and fraudulent slide set in order to elicit the false testimony of NSF attorney Montgomery Fisher, in order to prove Jha's mens rea to commit the alleged crime."

As noted, there is no merit to the underlying premise regarding a "forged and fraudulent slide set . . . ." Therefore, the rest of the claim fails. And, as the government puts it, "the defendant offers nothing but his own opinion about the witnesses' credibility." ECF 207 at 14. It was the function of the jurors to assess the credibility of the witnesses, and they did. Inconsistencies in testimony are not necessarily the result of perjury. To the extent there were contradictions in testimony, if any, this was a matter for the jury to weigh. The jury clearly found the government's witnesses credible, while rejecting the testimony of the defendant.

### D. Claims Five and Seventeen: Motion in Limine Concerning the Slide Presentation

Petitioner asserts that the Court committed a legal error in permitting the introduction of the slide presentation of NSF attorney Montgomery Fisher, used at the March 2008 grantee workshop attended by Jha. ECF 180 at 30. Although this issue was addressed on appeal, Jha asks this Court to revisit its ruling, claiming that the government made misrepresentations on appeal. ECF 180 at 30.

This issue was resolved on appeal. *Jha*, 613 Fed. App'x at 213. I discern no basis for relief.

### E. Claims Six and Sixteen: Motion to Suppress Evidence

Among the many defense motions filed in this case, Jha's lawyer filed a pretrial motion to suppress evidence seized from Jha's home, pursuant to a search warrant. ECF 31 (Search Warrant). Jha argues that Special Agent Pritchard knew that "Jha's company only operated from the basement of Jha's house," and Pritchard "withheld this information from the issuing magistrate." ECF 180 at 31. According to Jha, there was no legal basis to search his entire home, and this Court "overlook[ed] the evidence presented by Jha that SA Pritchard knew full well that Jha's company only operated from the basement of Jha's house and therefore, Pritchard deliberately withheld this information from the issuing magistrate." *Id.*

This Court addressed the same contention, among others, in its ruling denying the motion. The Court stated, ECF 96 at 3: "[T]here is no merit to the defense contention that the affiant should have limited his request for a search warrant to the basement area of Dr. Jha's residence in Severn, Maryland. As the Government points out, the defense's argument overlooks the many submissions made by the defendant (and others) during the relevant time period [that Jha] utilized the Severn address; no distinction was drawn between the basement and the rest of defendant's residence. To

the contrary, there was ample evidence to support the Government's belief that ATRC's place of business was Jha's residence, and that evidence of the crimes would not necessarily be limited to the basement."

As Jha acknowledges, this issue was raised in his direct appeal. But, he claims that the Fourth Circuit was misled by government misrepresentations that the government did not know the "physical boundary" of Jha's business at the time of the search. ECF 180 at 45. On this basis, he claims his conviction must be set aside. This contention lacks merit, for the reasons stated previously.

In addition, Petitioner argues that the Court was biased and placed "extreme time pressure" on defense counsel, forcing him to allow the Court to decide various matters on the pleadings. ECF 203 at 10. The Court was not biased, nor did it place extreme pressure on the defense. *See*, *e.g.*, J.A. Vol. II, p. 784 (Court stating to defense counsel: "I'm trying to give you as much latitude, Mr. Wright, as I possibly can so that there's no complaints later. So I am trying, very mindfully trying to be as flexible as I can.").

### F. Claim Seven: "Newly Revealed Evidence"

Jha contends that in the government's response to his Rule 50(b) motion, the government failed to deny his allegations of fraud, misrepresentation, and misconduct by the government. Therefore, he presents the novel contention that the government admitted to such misconduct "and cannot change course now." ECF 180 at 32. The government maintains that it vigorously disputed Jha's contentions, and it cites from its submissions to that effect. *See* ECF 207 at 16-17.

Even if the government did not expressly deny the defendant's assertions, I agree with the government that this would not amount to "a stipulation to the accuracy of the allegations." *Id.* at 17. A similar argument was advanced by Jha in his motion for a new trial under Rule F.R. Crim.

P. 33.  ECF 166 (Motion) at 9-10; ECF 172 (Jha's Reply) at 5 (reiterating that government's failure to respond to his certiorari petition constituted an admission as to his assertions).  He argued, *inter alia*, that because the Solicitor General of the United States did not respond to his certiorari petition, this constituted a stipulation by the government as to the accuracy of the facts and law asserted by Jha.

In my Memorandum of June 13, 2016 (ECF 173), denying Jha's motion for new trial, I said, *id.* at 7:  "'[T]he Solicitor General's determination that Jha's certiorari petition did not merit a formal response is not the procedural equivalent of a stipulation or concession, and there is not law to support such a legal argument.'" (Quoting ECF 171 at 3).  The same rationale applies here. This contention is without merit.

### G.  Claims Five, Eight, and Twenty-Three:  MSU emails; Ineffective Assistance of Counsel

Jha identifies several instances in which his retained counsel, Daniel Wright, allegedly failed to provide effective assistance of counsel.  None of them meets either prong of the *Strickland* test, outlined earlier.

First, Jha contends that Wright did not "challenge the government" to find the "other sources" of MSU emails.  However, as noted earlier, the government disclosed the two locations where MSU emails were located, in addition to being on the MSU server:  the defendant's home office computer and his gmail account, both of which were searched with lawfully issued warrants. Thus, it would have served no purpose for Mr. Wright to further "challenge the government" at the motions hearing for the location of the "other sources," because they were already known to the defense.

Moreover, the search warrants were deemed lawful by this Court and the Fourth Circuit. As a result, the MSU emails were in the government's lawful possession, whether directly seized from the MSU server or from one of the two other identified sources.

Jha also maintains that Wright should have "pressed the Court to hold an evidentiary hearing" on the issues of the search of his home office and his motion in limine regarding the admissibility of the NSF slide show. ECF 180 at 33-34. As to the search of the home office, the defendant identifies a single letter wherein the defendant's former attorney stated that his home office at Blairfield Court was located in the basement of the house. *Id*. at 33. However, all the documents in evidence regarding ATRC's office location at Blairfield Court, including all three fraudulent grant applications and all NSF correspondence submitted by the defendant, make no distinction between the upstairs or downstairs of the house.

As the government asserts, "[i]t was professionally reasonable for Mr. Wright to strategically select which of the *dozens* of pleadings he had filed on behalf of the defendant 'to press' with the Court and [on] which ones to submit . . . ." ECF 207 at 18. In light of "the overwhelming evidence that the home office's location within the house was not identified by the defendant in any of his many NSF filings, the presumption under the law is that it was reasonable for Mr. Wright to strategically submit that issue to the Court on the pleadings. Consequently, his performance was not deficient." *Id.* at 18-19. Further, under the second prong of *Strickland*, the defendant cannot establish that, but for the alleged professional error, the outcome of the pretrial ruling or the trial would have been different.

Jha also argues that Mr. Wright should have "expanded" the scope of his motion in limine (ECF 65) to include alleged facts that "would have undermined the government's position regarding (1) the timing under the NSF grant solicitations when the defendant had to show a third-

party's investment in his highway project and (2) the prohibition against using funds under federal subcontracts for personal expenditures . . . including student stipends." ECF 207 at 19; *see also* ECF 180 at 34. However, the motion addressed expenses accountable under a "fixed amount award," although perhaps not as expansively as the defendant now believes is appropriate. ECF 207 at 20; *see* ECF 65 at 1-3.

The NSF and DOD documents and related testimony were part of the government's evidence to establish the fictitious third-party investments in ATRC and Jha's procurement of student stipend payments under the DOD research contracts. Because they were probative of the fraud, they were admissible. Nevertheless, the Court's ruling did not limit the defense from presenting documents and testimony that might have contradicted the government's position on these matters. Therefore, Wright was not ineffective for failing to include more detail about these issues in the motion in limine.

The last claim of ineffectiveness relates to Jha's earlier claim that the government committed *Brady* and *Giglio* violations, as discussed earlier. Jha complains that his attorney should have raised these violations on direct appeal. But, there is no evidence of such violations. Consequently, Mr. Wright's performance in this regard did not fall below "an objective standard of reasonableness," and the outcome of the proceedings would not have been any different under the *Strickland* analysis. *See United States v. Rangel*, 781 F.3d 736, 745 (4th Cir. 2015) (prejudice in the appellate context requires the defendant to establish that there was a reasonable probability that he would have prevailed on the issue he claims his attorney should have raised); *Mikalajunas*, 186 F.3d at 493 (an attorney's failure to pursue an issue on appeal due to a "mere misapplication of the likelihood of success" does not constitute constitutionally ineffective assistance).

The government is correct in its assertion (ECF 207 at 21) that, even if there was some merit to the nondisclosure claims, Wright was not required to litigate every conceivable issue on appeal. *Jones v. Barnes*, 463 U.S. 745, 751 (1983); *see also, Engle v. Isaac*, 456 U.S. 107, 134 (1982) ("[T]he Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim.").

## H. Claim 9: New Legal Rules

Jha argues that new rules of criminal conduct decided during the pendency of this case are retroactively applicable to his case and therefore a reversal of his conviction is required. ECF 180 at 36. He cites the following cases: *Elonis v. United States*, 135 S. Ct. 2001 (2015); *Teva Pharms USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831 (2015); *Johnson v. United States*, 135 S. Ct. 2551 (2015); *United States v. McLean*, 802 F.3d 1228 (11th Cir. 2015); *United States v. Nagle*, 803 F.3d 167 (3rd Cir. 2015); *United States v. Alphas*, 785 F.3d 775 (1st Cir. 2015).

The cases cited by Jha have no bearing here, either because they do not announce a new rule of law or the rulings are inapplicable to the criminal offenses charged in this case. For example, *Johnson* invalidated the residual clause of the Armed Career Criminal Act as unconstitutionally vague. *Johnson*, 135 S. Ct. at 2558. Jha was never found to be an armed career criminal.

The Supreme Court stated in *Teague v. Lane*, 489 U.S. 288 (1989), that a "new rule" is one that "breaks new ground or imposes a new obligation on the States or the Federal Government." *Id.* at 301; *see also Chaidez v. United States*, 568 U.S. 342, 347-48 (2013). In other words, "a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Welch v. United States*, ___ U.S. ___, 136 S. Ct. 1257, 1264 (2016)

(quoting *Teague*, 489 U.S. at 301) (alteration omitted and emphasis added). *See also Chaidez*, 568 U.S. at 347; *Wright v. West*, 505 U.S. 277, 304 (1992) (O'Connor, J., concurring).

Jha has done little more than find *dicta* reiterating well honed principles of law that existed during the pendency of his case.

### I. Claim 10:  Request for Additional Discovery to Establish Judicial Bias

The defendant seeks discovery to establish the bias of the Court, without any indication of what he believes the discovery will establish.  The Court previously denied Jha's request for discovery.  *See* ECF 189; ECF 198 at 2.  There is no basis to revisit that ruling.

### J. Claim 18:  Proffer Agreement

Jha argues that the government violated the proffer agreement by filing a motion in limine, prior to trial, to keep Jha from testifying at odds with his pretrial proffer statement to the government.   Moreover, the government submitted the proffer statement with the motion in limine, "thereby, releasing Jha's incriminating statement 'before' any of the items stated in the proffer agreement were met."  ECF 203 at 13.

Jha notes that he asked the Court to deny the government's motion in limine.  And, despite Jha's repeated claims of bias on the part of the Court, he acknowledges that the Court "agreed and denied [the] government's motion – in – limine."  *Id.*  Moreover, he notes that in the interest of precluding any disclosure of the contents of the proffer statement, the Court ordered the sealing of the motion-in-limine (again, despite Jha's claims of bias on the part of the Court).  *Id.*  Yet, Jha maintains the Court was prejudiced because the Court was exposed to prejudicial evidence.  *Id.* On this basis, he claims that he is entitled to a new trial.

In addition, Jha asserts that "there is a presumption of prejudice where such improper evidence has been made available to the jury . . . ."  *Id.* at 14.  However, there is no evidence that

the proffer was disclosed to the jury. Moreover, the Court has no independent recollection of reviewing the actual contents of the proffer, which was unnecessary to resolve the motion. In any event, the Court is well equipped to disregard information that is not properly before the Court. This claim is frivolous.

### K. Claim 19: The Government's Demand for Testimonial Evidence

The defendant challenges two occasions when NSF requested information about ATRC's grant application. ECF 203 at 14. First, an NSF employee responsible for processing the grant request asked Jha, as the owner of ATRC, to provide proof of an investment of ATRC by a third party. *Id.* at 14. Second, NSF-OIG asked Jha to provide information about employee time sheets and records of grant expenditures. According to Jha, the information sought by the NSF program manager and NSF-OIG "violated the plain terms of the NSF grant conditions . . . ." ECF 203 at 14. Moreover, he claims that the government's conduct violated his rights under the Fifth Amendment. *Id.*

As the government notes, there is no evidence that the requests did, in fact, violate any grant conditions. Moreover, there was no directive to defendant to supply the requested information. For example, there was no grand jury subpoena. Jha voluntarily responded to the request and, in doing so, provided false information. And, the defendant cannot assert a Fifth Amendment privilege on behalf of ATRC. *Doe v. United States*, 487 U.S. 201, 206 (1988).

As to this topic, Jha concludes that, to the extent this matter was not previously raised, it is due to be ineffective performance of his attorney. But, his claims have no merit. It follows that his attorney was not ineffective for failing to raise these issues.

## L.  Ground Twenty: Actual Innocence

Jha insists that he is "factually innocent of the alleged crimes" and, on this basis, the Court should vacate his conviction and sentence.  ECF 203 at 16.

The actual innocence exception "only applies in limited circumstances."  *United States v. Jones*, 758 F.3d 579, 583 (4th Cir. 2014).  As the Fourth Circuit recently said, "A valid actual innocence claim 'requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial.'"  *Finch v. McKoy*, ___ F.3d ___, 2019 WL 324667, at *4 (4th Cir. Jan. 25, 2019) (quoting *Schlup*, 513 U.S. at 324).

Moreover, a petitioner must "'demonstrate that the totality of the evidence would prevent any reasonable juror from finding him guilty beyond a reasonable doubt, such that his incarceration is a miscarriage of justice.'"  *Finch*, 2019 WL 324667, at *4 (quoting *Teleguz v. Pearson*, 689 F.3d 322, 329 (4th Cir. 2012)).  It is an "exacting standard," based on a "'holistic judgment about all the evidence'. . . ."  *Finch*, at *5 (quoting *House v. Bell*, 547 U.S. 518, 539 (2006)).

In order to show "actual innocence," the petitioner "must demonstrate actual factual innocence of the offense of conviction, *i.e.*, that petitioner did not commit the crime of which he was convicted; this standard is not satisfied by a showing that a petitioner is legally, but not factually, innocent."  *Mikalajunas*, 186 F.3d at 494 (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)); *see also Bousley*, 523 U.S. at 623.  Moreover, the petitioner must meet his burden by clear and convincing evidence.  *Mikalajunas*, 186 F.3d at 494.  In other words, a "petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence."  *Jones*, 758 F.3d at 583 (emphasis added); *see Bousley*, 523 U.S. at 623.

Petitioner falls woefully short; he has not demonstrated actual innocence. The jury was tasked with determining whether the government proved the guilt of the defendant as to the various charges, beyond a reasonable doubt. Based on the overwhelming evidence of the defendant's guilt, the jury concluded that the defendant was guilty of all charges.

### M. Summary

Jha has presented many arguments in his numerous submissions. To the extent that the Court has not expressly addressed all of Jha's contentions, they have nonetheless been considered and are hereby rejected.

In Jha's effort to cast blame on all but himself, he asserts many legal challenges and lodges specious accusations of misconduct, while overlooking the overwhelming evidence of his guilt. It is as if he sees a few trees while ignoring the surrounding, vast forest.

## VI. Certificate of Appealability

Pursuant to Rule 11(a) of the Rules Governing Proceedings under 28 U.S.C. § 2255, the court is required to issue or deny a certificate of appealability ("COA") when it enters a final order adverse to the applicant. A COA is a "jurisdictional prerequisite" to an appeal from the court's earlier order. *United States v. Hadden*, 475 F.3d 652, 659 (4th Cir. 2007). In other words, unless a COA is issued, a petitioner may not appeal the court's decision in a § 2255 proceeding.[5] 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b).

A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see Buck v. Davis*, ___ U.S. ___, 137 S. Ct. 759, 773 (2017). Where the court denies a petitioner's motion on its merits, a petitioner satisfies this

---

[5] The denial of a COA by the district court does not preclude Petitioner from seeking a COA from the appellate court.

standard by demonstrating that reasonable jurists would find the court's assessment of the constitutional claims debatable or wrong. *See Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003).

Petitioner has not made a substantial showing of the denial of his constitutional rights. Therefore, I decline to issue a COA. And, I shall deny the recent discovery request. ECF 247.

An Order follows.

Date: February 27, 2019
                                        _____/s/_____
                                        Ellen L. Hollander
                                        United States District Judge